# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOLENE EICHER,<br>       Defendant | Criminal Action No. 22-0038 (CKK) |

## MEMORANDUM OPINION AND ORDER
(October 20, 2022)

This criminal case is one of several hundred arising from the insurrection at the United States Capitol on January 6, 2021. For her actions at the Capitol on January 6, Defendant Jolene Eicher ("Defendant" or "Eicher") is charged by information with four misdemeanors. Before the Court is Defendant's [31] Motion to Transfer Venue. Defendant argues that this matter should be transferred to the United States District Court for the Western District of Virginia because, she insists, no biased jury could be empaneled in this district. Like every other court of this jurisdiction to consider the same argument,[1] and upon consideration of the briefing,[2] the relevant legal authorities, and the entire record, the Court shall **DENY** Defendant's Motion.

---

[1] *E.g.*, *United States v. Nassif*, Crim. A. No. 21-421 (JDB), 2022 WL 4130841 (D.D.C. Sept. 12, 2022); *United States v. Brock*, --- F. Supp. 3d ---, 2022 WL 3910549, at *5-6 (D.D.C. Aug. 31, 2022) (JDB) *United States v. Garcia*, Crim. A. No. 21-0129 (ABJ), 2022 WL 2904352, at *15 (D.D.C. July 22, 2022); *United States v. Rhodes*, --- F. Supp. 3d ---, 2022 WL 231554, at *21-23) (D.D.C. June 28, 2022) (APM); *United States v. Bochene*, 579 F. Supp. 3d 177, 181-82 (D.D.C. 2022).

[2] The Court's consideration has focused on:
- The Government's Statement of Facts in Support of its Criminal Complaint, ECF No. 1-1 ("Aff.");
- Defendant's Motion to Transfer Venue, ECF No. 30 ("Motion" or "Mot."); and
- The Government's Opposition to Defendant's Motion to Transfer Venue, ECF No. 32 ("Opp.").

Defendant did not file a reply in support of her Motion.

In an exercise of its discretion, the Court has concluded that oral argument would not be helpful in the resolution of the Motion.

## I. BACKGROUND

Defendant is charged by information with: (1) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (3) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

**A. Certification of the 2020 Presidential Election and Capitol Riot**

The Twelfth Amendment of the United States Constitution provides that, after the members of the Electoral College "meet in their respective states and vote by ballot for President and Vice-President," they "shall sign and certify [their votes], and transmit [them] sealed to the seat of government of the United States, directed to the President of the Senate." U.S. Const. amend. XII. The Vice President of the United States, as President of the Senate, must then, "in the presence of the Senate and House of Representatives, open all the certificates[,], and the votes shall then be counted." To count the votes and "declar[e] the result" of the Electoral College, federal law mandates that "Congress shall be in session on the sixth day of January succeeding every meeting of the electors" and that "[t]he Senate and House of Representatives shall meet in the Hall of the House at the hour of 1 o'clock in the afternoon on that day." 3 U.S.C. §§ 15-16.

Pursuant to the Constitution and federal law, Congress convened in a joint session on 1:00 PM on January 6, 2021, to count the votes of the Electoral College and certify the results of the 2020 Presidential Election, which had taken place on November 3, 2020. *See* Aff. at 1. With then-Vice President Michael R. Pence presiding, proceedings began and continued until 1:30 PM, when the United States House of Representatives and the United States Senate adjourned to separate

chambers within the Capitol to debate and consider an objection to the Electoral College vote from the State of Arizona. *Id.* Vice President Pence continued to preside in the Senate chamber. *Id.*

Shortly before noon, then-President Donald J. Trump took the stage at a rally of his supporters staged just south of the White House. *Trump v. Thompson*, 20 F.4th 10, 17 (D.C. Cir. 2021). Then-President Trump declared that the election was "rigged" and "stolen," and urged the crowd to "demand that Congress do the right thing and only count the electors who have been lawfully slated." *Id.* at 18 (cleaned up). During and after then-President Trump's speech, a mass of attendees marched on the Capitol. *See id.*

As they gathered outside the Capitol, the crowd faced temporary and permanent barricades and Capitol Police positioned to prevent unauthorized entry to the Capitol. *United States v. Rivera*, --- F. Supp. 3d ---, 2022 WL 2187851, at *3 (D.D.C. June 17, 2022). Shortly after 2:00 p.m., "crowd members forced entry into the Capitol building, including by breaking windows and assaulting Capitol Police officers, while others in the crowd encouraged and assisted those acts." *Id.* (internal quotation marks omitted). Although police "engaged in combat with the rioters to prevent them from further breaking police lines," the police were ultimately unsuccessful. *Id.* at *3 (internal quotation marks omitted). The insurrection "desecrated [the Capitol], blood was shed, and several individuals lost their lives." *Thompson*, 20 F.4th at 19. All told, "[t]he events of January 6, 2021 marked the most significant assault on the Capitol since the War of 1812." *Id.* at 18-19 (footnote omitted).

**B. Events Specific to Defendant**

Defendant is one of more than 800 individuals charged with federal crimes for her conduct on January 6th. According to the allegations in the Indictment and the Statement of Facts in

3

support of the Criminal Complaint,³ Defendant traveled from central Virginia to the District of Columbia and attended then-President Trump's rally. *See* Aff. at 8. After the rally, Eicher made her way to the Capitol and entered the building through a broken glass door. *Id.* at 4. At some point while on Capitol grounds, Defendant was pepper sprayed; nevertheless, she remained. *See id.* at 5. After returning home, Defendant celebrated her conduct with others, gushing "Woohoo!!!!!" to a Facebook friend, and bragging "I made it all the way up [into the Capitol] too! 😊". *See id.* at 5-6.

## II.    LEGAL STANDARD

The Sixth Amendment guarantees criminal defendants the right to a trial "by an impartial jury of the State and district wherein the crime [was allegedly] committed." U.S. Const. amend. VI. Criminal trials occur in the jurisdiction "where the said Crimes [were allegedly] committed." U.S. Const. art. III, § 2, cl. 3. Pursuant to Federal Rule of Criminal Procedure 21(a), upon a defendant's motion, "the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." In other words, "if extraordinary local prejudice will prevent a fair trial," transfer is "a basic requirement of due process." *Skilling v. United States*, 561 U.S. 358, 378 (2010). To determine prejudice, the Court considers the following factors: (1) "the size and characteristics of the community in which the crime occurred;" (2) whether media coverage of the crime "contained [a] confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected

---

³ "It is appropriate if not necessary to rely on other official documents for the specific factual allegations underlying the [] Indictment, as the indictment itself contains few, if any, details about [Defendant's] alleged conduct." *United States v. McHugh*, --- F Supp. 3d ---, 2022 WL 296304 at *2 n.2 (D.D.C. Feb. 1, 2022) (JDB); *accord United States v. Mostofsky*, Crim. Action No. 21-138, 2021 WL 6049891 at *1 (D.D.C. Dec. 21, 2021) (JEB).

4

to shut from sight;" and (3) whether the time between the crime and the trial has "diminished" the "level of media attention." *Id.* at 382-83. A "presumption of prejudice . . . attends only in the extreme case." *Id.* at 381.

### III.     DISCUSSION

Before turning to the *Skilling* factors, the Court begins with the default practice of this jurisdiction to conduct voir dire in order to determine whether a fair and impartial jury can be seated. *United States v. Haldeman*, 559 F.2d 31, 41 (D.C. Cir. 1976) (in Watergate trial, holding that voir dire was necessary to determine whether Washington, DC panel would be impermissibly prejudiced). "[P]retrial publicity, even if pervasive and concentrated, cannot be regarded as leading automatically in every kind of criminal case to an unfair trial." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 565 (1976). Only at voir dire does it become "evident" that "an impartial jury cannot be selected." *Haldeman*, 559 F.2d at 63. As *Haldeman* exemplifies, juries have been successfully seated in the face of national press coverage of events deeply damaging to American democracy. Transfer is the exception, not the rule, even in the post politically-charged and widely-reported cases. *United States v. Garcia*, Crim. A. No. 21-0129 (ABJ), 2022 WL 1904352, at *6 (D.D.C. July 22, 2022).[4] As *Garcia* notes, courts of this jurisdiction "have had little difficulty qualifying enough jurors to empanel a jury" in cases arising from the insurrection. *Id.* at *10 (collecting cases); *see also* Minute Entry, *United States v. Rhodes*, Crim. A. No. 22-15 (APM) (Oct. 3, 2022) (empaneling jury in seditious conspiracy case against "Oathkeepers" militia). As such, even before turning to the *Skilling* factors, Defendant faces a high bar in establishing the prejudice necessary

---

[4] *Citing In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (transfer out of Boston courthouse unnecessary for Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (transfer out of Houston courthouse unnecessary for fraud trial of CEO of Enron Corporation, resident in Houston); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (transfer out of New York City courthouse unnecessary for trial of participant in 1993 World Trane Center bombing).

to warrant the extraordinary remedy of transfer.

*First*, Washington, DC's "size and characteristics" weigh against transfer. As to size, generally, there is a "reduced likelihood of prejudice where [the] venire [is] drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382; *see also United States v. Taylor*, 942 F.3d 205, 223 (4th Cir. 2019). As Washington, DC has over 600,000 residents, size is no matter here. *Brock*, 2022 WL 3910549, at *6. Nor do Washington, DC's political leanings justify transfer. *See Haldeman*, 559 F.2d at 64 n.43 (rejecting argument that Washington, DC's electoral support for Democratic Party counseled transfer for Republican Watergate defendant); *Brock*, 2022 WL 3910549, at *6 ("'assumptions concerning party affiliation in the District are not an appropriate basis for changing venue'" and "any impressions or opinions . . . based on [defendant's] presumed political views" could "be assessed during voir dire'" (quoting Order, *United States v. Alford*, Crim. A. No. 21-263 (TSC) (D.D.C. Apr. 18, 2022)). Defendant is not, of course, on trial for her political beliefs, but rather for her alleged criminal actions during the insurrection.

*Second*, although there has and continues to be substantial news coverage of the insurrection and the proceedings arising therefrom, "[t]he mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *See United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995). It must also be noted that this news coverage is *national*; every major national outlet has devoted substantial coverage to the insurrection generally. Although local press has also covered the insurrection, most communities throughout the country have been exposed to the exact same coverage as Washingtonians. *See United States v. Chapin*, 515 F.2d 1274, 1288 (D.C. Cir. 1975) ("[P]recedent demands that the court take into account whether the publicity is sufficiently localized that potential jurors in another area would be free of any taint from exposure to the press, allowing the

6

change to serve its purpose."). Moreover, Defendant identifies no pretrial publicity that identifies her specifically. "[W]hen publicity is about the event, rather than directed at individual defendants, this may lessen the prejudicial impact." *Skilling*, 561 U.S. at 384 n.17; *see also Garcia*, 2022 WL 2904352, at *9 (as here, "this particular [January 6th prosecution] has not been the subject of attention" in the press). As such, even if there were local coverage of Defendant specifically, this second factor would weigh against transfer.

*Third*, it is true that there remains substantial press coverage on the insurrection and its ramifications for American democracy, but none of that coverage implicates Defendant herself. Indeed, "the focus [of this press coverage] has switched to legal and political machinations . . . to substitute electors or overturn the results of [free and fair] elections in other ways, and there has been little mention of the rioters themselves." *Garcia*, 2022 WL 2904352, at *9. Even were there substantial, salient coverage, courts of this jurisdiction should not "rely[] too heavily on pretrial publicity . . . as such an inquiry is only an 'attempt to determine from [the court's] own reactions how the community would respond to that publicity.'" *Brock*, 2022 WL 3910549, at *8 (quoting *Haldeman*, 559 F.2d at 62 n.37). Again, the Court can only guess whether "primarily factual reporting of the events of January 6th will have [prejudicial effect as to] a relatively unknown defendant" such as Eicher here. *See id.* As with the prior two factors, "a vigorous voir dire should suffice to root out any bias in individual jurors." *Id.*

## IV.    CONCLUSION

In sum, none of the *Skilling* factors merit the extraordinary remedy of transfer in this case. Consistent with binding appellate precedent, every other court of this jurisdiction to consider the

question, and the foregoing reasons, it is hereby

**ORDERED**, that Defendant's [31] Motion to Transfer Venue is **DENIED**.

**SO ORDERED**.

Dated: October 20, 2022

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge