**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-38 (BAH)** |
| **v.** | : | |
| | : | |
| **JOLENE EICHER,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jolene Eicher to 9 months of incarceration (the midpoint of the applicable guidelines range), 1 year of supervised release, 60 hours of community service, a $70 special assessment, and $500 in restitution.

## I.      Introduction

Defendant Eicher, 32 years old, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

On June 14, 2023, the jury found Eicher guilty of all four counts charged in the Superseding Information, ECF No. 20:

Count 1:    Entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1);

Count 2:    Disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2);

Count 3:    Disorderly conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); and

Count 4:    Parading, demonstrating, or picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).

As explained herein, a sentence of incarceration at the midpoint of the guideline range is appropriate in this case because Eicher (1) ignored clear warning signs not to enter restricted Capitol grounds, including fencing, "Area Closed" signs, chemical spray, and "flash bangs"; (2) observed violence against officers; (3) was consistently at the forefront of the violent mob on the West side of the Capitol, often directly across from officers while they were fighting off other rioters; (4) actively assisted other rioters with climbing onto the Lower West Terrace; (5) entered the Capitol building through a broken window at the Senate Wing Door; (6) took videos and photos inside the Capitol building and on restricted Capitol grounds; (7) celebrated her participation in the riot on social media; and (8) has shown no remorse for her actions.  Eicher constantly stood at the very front line of rioters attacking police and, at times, within mere feet or an arm's length from law enforcement officers who fought desperately and heroically to protect the Capitol, risking their own lives against the overwhelming numbers and force of the mob that ultimately overtook them and forced its way into the Capitol building.

---

million) as reflected in this memorandum. Hoever, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The Court must also consider that Eicher's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Eicher's crime support a sentence of 9 months of incarceration, 1 year of supervised release, 60 hours of community service, and $500 in restitution in this case.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the Statement of Facts filed with the Complaint in this case, ECF No. 1-1, and paragraphs 9 through 15 in the Presentence Report (PSR), ECF No. 90, for a short summary of the January 6, 2021 attack on the U.S. Capitol.

### Defendant Eicher's Role in the January 6, 2021 Attack on the Capitol

The evidence at trial showed Eicher repeatedly at the forefront of the riot. Her conduct was entrenched in the riot's aims and actions, and she enhanced the mob's efforts to attack and overwhelm law enforcement officers in an attempt to storm the Capitol building and Congress.

Eicher traveled to Washington, D.C. to attend the "Stop the Steal" rally on January 6, 2021. After former President Trump's speech, Eicher—who wore a distinctive brightly colored headwrap, purple shirt, and tan jacket—moved with the crowd to the West Front of the Capitol. Despite obvious restrictions on public access, including placed barricades, fencing, and "Area Closed" signs, Eicher entered the restricted grounds and, at some point before approximately 2:00 p.m., reached the Capitol's West Plaza. *See* Tr. Ex. 701A.

3



*Tr. Ex. 701A (Eicher circled in yellow)*

She eventually reached the front of the West Plaza crowd, where, directly in front of her, Metropolitan Police Department ("MPD") and United States Capitol Police ("USCP") officers positioned themselves to prevent the now-violent mob from advancing into the Capitol building. As the jury heard from MPD Officer Noah Duckett and USCP Captain Carneysha Mendoza, the officers struggled immensely against the rioters. Captain Mendoza testified about the fencing and the signs that had been erected around the restricted area of the Capitol grounds, and about the chemical spray and munitions deployed by the officers. Eicher saw all of these things. Officer Duckett testified about his battalion's desperate efforts to hold the line against the mob that outnumbered them many times over. He testified about officers playing a recorded dispersal order over a loudspeaker positioned at the front of the mob, right where Eicher stood. And he testified about how police were forced to use tear gas, munitions, and their own physical force to try to stop the mob. The jury was able to see Eicher on Officer Duckett's body-worn camera footage as she stood defiantly with rioters that were attacking the police and shielded herself from gas and chemical spray. *See* Tr. Exs. 302B, 302C. Eicher would later eagerly tell others on social media that she "Got pepper sprayed!" and "held the line." Tr. Exs. 409, 414. *See Tr. Ex. 704A.*



*Tr. Ex. 302B*



*Tr. Ex. 302C*



*Tr. Ex. 704A (Eicher circled in yellow)*

Fighting the police, the rioters around Eicher used their own chemical sprays and hurled objects. *See* Tr. Ex. 105.



*TR. EX. 105 (Eicher circled in yellow)*

Later, Eicher found an image of herself in the center of the melee against police. She circled herself multiple times in red and sent it to a friend—ensuring others would know her accomplishment. *See* Tr. Ex. 415 (excerpt photo).



*Tr. Ex. 415*

Eicher remained on the front lines of mob for at least a half-hour, until the police line fell, and the crowd began flooding the Lower and Upper West Terraces. As the riot pushed closer to the Capitol building, Eicher moved with and encouraged it, as she—at one point—physically assisted other rioters attempting to ascend onto the Lower West Terrace:



*Tr. Ex. 706*

After helping other rioters gain access to the Lower West Terrace, Eicher made her way to the Northwest Courtyard and the Senate Wing Door. At approximately 3:28 p.m., Eicher climbed through a broken window next to the Senate Wing Door and entered the U.S. Capitol, where she and her fellow rioters could cheer what they had done and celebrate the desecration of the building, the threat to Congress, and the enduring damage to American democracy. *See* Tr. Ex. 700B. Eicher even made her way to the middle of an interior hallway and took some pictures on her phone. *See* Tr. Ex. 414 (photo taken by Eicher inside the Capitol and sent to others).



*Tr. Ex. 700B (Eicher circled in yellow)*



*Photo from Tr. Ex. 414*

Eicher was then directed by officers back toward the exit. At approximately 3:32 p.m., she exited the Capitol building through the Senate Wing Door. Eicher remained on the Capitol grounds for an additional period of time and recorded a video of the mob assembled on the Northwest Courtyard and Upper West Terrace. She also pointed the camera at herself, grinning with pride, and affirmed that she was "still alive." *See* Tr. Ex. 805. All of this occurred as members of Congress and their staff were forced to hide, officers endured further struggles against the riot, and the safe function of American government remained in jeopardy.

*Eicher's Facebook Activity*

As referenced above, evidence admitted at trial showed that Eicher used Facebook to frequently discuss the riot and her thoughts on the riot both during and after January 6, 2021.

9

For example, on January 6, in response to a "concerned" friend asking her whether she was "ok up there in DC," Eicher exclaim that she was "Alive and well, made a couple of friends, held the line . . . ." Tr. Ex. 409.

Shortly after leaving the riot, Eicher was asked by a friend to "[d]escribe what you saw in 3–5 words." Tr. Ex. 414. Eicher responded "What. The. Crap. Woohoo!!!!!!!" *Id.* She also told that friend she had been pepper sprayed and described the riot as "the best experience ever!" *Id.* She regretted having been unable to see the "[S]enate hall" because the police "had already chased everyone out from there and about 15 minutes later a ton of officers came po[u]ring out from that area and slowly pushed back the crowd." *Id.* According to Eicher, "[t]his kind [o]f stuff is in my blood." *Id.*

In the days after January 6, Eicher messaged another friend "it's kinda funny how it[']s all panning out and" that she "figured the FBI w[ould] be on [her] doorstep one of the[se] days." Tr. Ex. 408.

Eicher also sent multiple photos from the riot to friends, including the following:



*Photo from Tr. Ex. 418*

*The Charges and Conviction*

On January 20, 2022, the United States charged Eicher by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On January 31, 2022, law enforcement officers arrested her in Richmond, Virginia. On March 11, 2022, the United States charged Eicher by a four-count Superseding Information with violating 18 U.S.C. §§ 1752(a)(1), (a)(2), and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). On June 12, 2023, a jury trial began, and on June 14, 2023, the jury returned a verdict finding Eicher guilty on all four counts.

## III.   Statutory Penalties

Eicher now faces sentencing on the four misdemeanor counts of conviction. As noted by the U.S. Probation Office, Eicher faces the following maximum penalties:

| Count | Offense | Max Prison Term | Max Term of Supervised Release | Max Fine | Mandatory Special Assessment |
|-------|---------|-----------------|-------------------------------|----------|------------------------------|
| 1 | 18 U.S.C. § 1752(a)(1) | 1 year | 1 year | $100,000 | $25 |
| 2 | 18 U.S.C. § 1752(a)(2) | 1 year | 1 year | $100,000 | $25 |
| 3 | 40 U.S.C. § 5104(e)(2)(D) | 6 months | n/a | $5,000 | $10 |
| 4 | 40 U.S.C. § 5104(e)(2)(G) | 6 months | n/a | $5,000 | $10 |

As discussed further below, Eicher must also pay restitution in the instant case.

**The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines total offense level set forth in the PSR. However, the PSR does not include a full Guidelines analysis for Count One. *See* PSR ¶¶ 33–41.[2] The U.S. Probation Office correctly calculated the offense level for Count Two under the Sentencing Guidelines as follows:

*Count Two* (18 U.S.C. § 1752(a)(2)):

Base Offense Level (U.S.S.G. §2A2.4(a))                                  10

*See* PSR ¶¶ 33–41. However, the Guidelines analysis should also include the following Guidelines calculation for Count One:[3]

*Count One* (18 U.S.C. § 1752(a)(1)):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[4] | +2 |
| Total Adjusted Offense Level | +6 |

---

[2] Sections 1B.1(a)(1)–(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)–(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)–(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The PSR does not follow these steps. It concludes that Counts One and Two group (PSR ¶ 32) —a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4).

[3] Counts Three and Four are Class B misdemeanors, or "petty offenses," to which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); 18 U.S.C. § 19; U.S.S.G. § 1B1.9.

[4] The specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).

Under U.S.S.G. §3D1.2, "closely related counts" group. Counts One (entering and remaining in a restricted area) and Two (disorderly and disruptive conduct in a restricted area) group because both counts involve the same victim (Congress) and the same criminal act or transaction or two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. *See* U.S.S.G. §3D1.2(a) and (b). Because Count Two has a higher offense level, the offense level for the group is the offense level for Count Two, which is 10. *See* U.S.S.G. §3D1.3(a).[5]

The U.S. Probation Office also calculated Eicher's criminal history as a category I. PSR ¶ 44. With no applicable adjustments, the U.S. Probation Office calculated Eicher's total offense level at 10, criminal history category I, and the corresponding Guidelines imprisonment range at six to twelve months incarceration. PSR ¶ 77.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

---

[5] No acceptance of responsibility adjustment is appropriate here, as Eichner went to trial and contested factual guilt. *See* U.S.S.G. §3E1.1 Application Note 2; *see also* PSR ¶ 25.

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 9 months of incarceration, 1 year of supervised release, 60 hours of community service, a $70 special assessment, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). Eicher's conduct on January 6, 2021, inevitably contributed to the danger posed that day. While assessing Eicher's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Eicher, the absence of violent or destructive acts is *not* a mitigating factor. Had Eicher engaged in such conduct, she would have faced additional criminal charges.

One of the most important factors in Eicher's case is her persistence in staying at the forefront of the mob on the West Front, no matter how chaotic and violent it grew. Tear gas, chemical spray, police presence, violence, dispersal orders, alarms, broken windows—none of it gave Eicher any pause. Distinct from other defendants who might have been present in another area or at a later time, Eicher was clearly at the *front* of mob during some of the most violent moments of the attack on Capitol and police.  Eicher maintained her position against officers within mere feet of them—just an arms' length away. She, at a minimum, saw first-hand, the officers' desperate struggle.  She saw officers, like Officer Duckett, being attacked, hit with objects, and

14

bear sprayed.  She heard the sirens and saw police deploy various munitions.  She knew that the officers' lives were in danger. Nevertheless, she joined the effort to overtake them.  Moreover, at every turn, when she could have, in the very least, stopped, she continued with the mob.

Relatedly, Eicher actively assisted other rioters in following in her footsteps by aiding those attempting to climb onto the Lower West Terrace during that tumultuous time. This made officers' job to secure the building and grounds all the more difficult.  Again, all of this occurred after Eicher witnessed some of the worst events of the riot unfold on the West Plaza. The chaos and fighting did not deter Eicher, who instead claimed "[i]t was an awesome day getting to witness it first hand!"  *See* Tr. Ex. 419. In all her time at the Capitol, Eicher continued onward, until she could finally celebrate with her fellow rioters at the end.

Based on the charges against this defendant, the particular facts of the case are only aggravating and compel a significant sentence. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Eicher

As set forth in the PSR, Eicher is college-educated and holds multiple medical certifications. Eicher has been compliant with her conditions of pre-trial release. Eicher reports being currently self-employed, although she previously worked as a paramedic, an occupation that should have made her acutely aware of gravity of the riot that was unfolding at the Capitol and the stress and danger that she and other rioters were causing for the police that day.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a period of incarceration. Eicher has never expressed anything even remotely bordering on remorse or acknowledgement for the seriousness of her conduct. To the contrary, she has contested every element of every charge and rejected every proposed factual and evidentiary stipulation at trial..  This failure, along with her voiced enthusiasm for the riot on social media and her actions on January 6, requires a sentence sufficient to deter Eicher from participating in similar future activity.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[6] This Court must sentence Eicher based on her own conduct and relevant characteristics, but should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.

Eicher has been found guilty of both Class A and B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do however, apply to all counts of conviction.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24–25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Rivera*, 21-cr-60 (CKK), following a bench trial, the defendant was convicted of the same four misdemeanor charges as Eicher.  The evidence showed that, on January 6, Rivera ignored numerous signs indicating he should not have been on Capitol grounds, and he recorded rioters making their way through the police line on the Lower West Terrace. Similar to Eicher, Rivera did not engage in violence personally but was part of the mob at the West side of the Capitol and witnessed violence against police officer at the Lower West Terrace. He encouraged rioters climbing up the Capitol building (yelling to them that "there's an easier way up!"); was at the front of the mob that was trying to breach the Senate Wing Door; entered the Capitol through a broken window adjacent to the Senate Wing Door; recorded (and live streamed) some of his time at the Capitol; and posted to social media about his time at the riot. Rivera's statements during and shortly after the riot indicated a lack of remorse.  Distinct from Eicher, Rivera only used words to encourage people as the climbed us the Capitol building from the Lower West Terrace to the Upper West Terrace.  Eicher lent actual physical aid to rioters climbing up from the West Plaza to the Lower West Terrance. After January 6, Rivera did not express remorse or contrition for his actions—instead, he celebrated his participation on social media. The court sentenced Rivera to eight months incarceration.

In *United States v. Alford*, 21-cr-263 (TSC), following a jury trial, the defendant was convicted of the same four misdemeanor charges as Eicher.  On January 6, Alford walked past obvious signs that the Capitol was restricted until he could find an unobstructed entrance. He entered through a Capitol building door that had clear signs that it had been broken into. After January 6, Alford celebrated his participation on social media and spread disinformation about the

riot. Unlike Eicher, at trial, Alford demonstrated a lack of candor and honesty during his testimony; the court found that Alford testified in a manner that was disingenuous, not forthcoming, and minimized his role. But like Eicher, Alford showed a lack of awareness of the seriousness and gravity of what happened on January 6. The court sentenced Alford to 12 months incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d

at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Eicher was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his or her] individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."). *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Eicher to pay $500 in restitution for her convictions. This amount fairly reflects Eicher's role in the offense and the damages resulting

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $500 has consistently been the agreed-upon amount of restitution and the amount of restitution imposed by other members of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 9 months of incarceration, 1 year of supervised release, 60 hours of community service, a $70 special assessment, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing his acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     */s/ Nathaniel K. Whitesel*
        NATHANIEL K. WHITESEL
        Assistant United States Attorney
        D.C. Bar No. 1601102
        601 D Street, N.W.
        Washington, D.C.
        nathaniel.whitesel@usa.doj.gov
        (202)252-7759

        */s/ Christopher Brunwin*
        CHRISTOPHER BRUNWIN
        Assistant United States Attorney
        California Bar No. 158939
        Central District of California
        312 N. Spring Street
        Los Angeles, California 90012
        christopher.brunwin@usdoj.gov
        (213)894-4242

25