# United States District Court
# District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| vs. | ) | Case No.  1:22-CR-00038-BAH |
| | ) | |
| Jolene Eicher | ) | |

**Defendant's Response to Government Sentencing Memorandum**

Matthew Hill
Assistant Federal Public Defender
201 Abingdon Pl
Suite 201
Abingdon, VA  24210

The Government seeks 9 months imprisonment for, "unlawful entry misdemeanors, such as in this case…" (ECF 93, P 17-18).  Jolene Eicher has proposed a sentence of substitute punishment, as recommended by the United States Sentencing Guidelines, along with a period of supervision.  The Court should reject the Government's prayer and impose the sentence advanced by Ms. Eicher. Here's why:

The government repeatedly asks the Court to sentence Ms. Eicher not for her actions but for the actions of others.  The sentence here must be for Jolene's actions.

When the government chooses to use "the mob" and "the riot" it is understandable.  Understandable because of the images from January 6.  Fear can be seen on the faces of the officers.  It can be Heard in their voices.  But, approaching sentencing for Jolene Eicher with the government's mob argument creates a challenge within the guidelines.  Guidelines the government repeatedly endorse as reasonable.

If the Court accepts the government's position that Jolene should be sentenced for the uncoordinated actions of the group of people on the Capitol grounds on January 6 the Court must measure the actions of Jolene against the individuals within the group in light of U.S.S.G. §3B1.2.  (See ECF 88, objections to PSR).  As detailed within that objection, application of those sections warrants a reduction in offense level for Ms. Eicher as a minimal participant.  Such a finding reduces the guideline range for Ms. Eicher to 0-6 months in zone A of the sentencing table.

Ms. Eicher filed several objections to the presentence report.  One of those objections was to application of the wrong guideline for the charged conduct.  The correct calculation of the base offense level is found within §2B2.3.  This section is the trespass guideline.  The government states that Jolene Eicher committed unlawful entry misdemeanors.  That is consistent with the verdict.  This supports a guideline calculation with a base offense level from §2B2.3.  Any calculation of base offense level under this section results in a guideline range of 0-6 months in zone A of the sentencing table.

Another individual with identical charges as those here is Antionne De Shaun Brodnax, Case No. 1:21-CR-350-PLF.  In that case the guideline applied for these same charges was U.S.S.G. §2B2.3.  This Court should agree with that finding and similarly apply the trespass guideline to the calculation here.

When a person is within zone A the Court is urged to avoid a term of imprisonment, U.S.S.G. §5C1.1.  The guidelines suggest that a sentence of imprisonment is not required for persons in zone A.  In these circumstances substitute punishment can be appropriate.  This supports the sentence proposed by Ms. Eicher.

The government repeatedly overstates the circumstances of the evidence presented regarding Ms. Eicher.  Ms. Eicher was not loud; she was not violent; she had no blue flag; she wore no red hat; she did not damage property; she did not cheer; she did not celebrate.  The evidence at trial only showed Jolene as the

peaceful person she is.  Taken in the light most consistent with the charged conduct and the verdict all of the evidence supports her presence but little more.

The government asserts as an aggravating factor that Jolene Eicher was always at the front.  This is not true.  This is particularly true regarding her arrival at the Senate wing door.

The evidence presented showed that Ms. Eicher did not arrive at the Senate wing door before about 3:25 p.m.  That arrival more than an hour after the window was broken.  This is hardly presence with the vanguard that the government suggests as an aggravator for Ms. Eicher.  Once inside the building the video seems to show Ms. Eicher within for just over three minutes.  Most of that three minutes is spent waiting in line to leave.

The government correctly recites that specific deterrence is the need to protect the public from further crimes by this defendant, (ECF 93, P 16) citing *United States v. Russell*, 600 F. 3d 631 (D.C. Cir. 2010).  However, the government's recitation of how the Court should evaluate the need to specifically deter Ms. Eicher misses this mark.  The conduct the government says must be specifically deterred is that Ms. Eicher has yet to express remorse for her conduct and that she had a trial.  Having a trial is not conduct which should be discourage with a sentence of imprisonment.

Ms. Eicher exercised her Constitutionally guaranteed trial rights.  Submitting this case to a jury is not an aggravating factor.  Presenting a thorough defense grounded in fact is not an aggravating factor for

sentencing.  When Ms. Eicher sought the opinion of 12 citizens regarding her conduct she is not disrespectful.  She is not dishonest.  She is a member of our community asking that what the Constitution promises be fulfilled.  When the government's attorney seeks a higher sentence because they were put to their burden they cheapen those same rights secured to all.

The Supreme Court has recognized that a criminal defendant "certainly may not be punished for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 386, 372 (1982).  "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978); see also *United States v. Jackson*, 390 U.S. 570, 581 (1968) (noting that imposing punishment to "penalize those who choose to exercise" their constitutional rights "would be patently unconstitutional").

Thus, the sentencing statutes like § 3533(a) and § 3661 cannot be read to allow a defendant's exercise of her constitutional or statutory rights to be a reason for increasing her punishment. *Bordenkircher*, 434 U.S. at 363 (holding that increasing a defendant's sentence in retaliation for a successful collateral appeal violated due process).  In *United States v. Hernandez*, 894 F.3d 1104,1112 (9th Cir. 2018), the Ninth Circuit held that the district court could not increase a defendant's sentence because he exercised his Sixth Amendment right to trial, rather than pleading guilty.  The court reasoned that "[e]nhancing a sentence solely because a defendant chooses to go to trial risks chilling future

criminal defendants from exercising their constitutional rights, and imposing a penalty for asserting a constitutional right heightens the risk that future defendants will plead guilty not to accept responsibility, but to escape the sentencing court's wrath." *Id.* Similarly, in *United States v. Cabrera*, 811 F.3d 801, 809-12 (6th Cir. 2016), the Sixth Circuit held that a district court could not increase a defendant's sentence for exercising his Fifth Amendment right to silence. The Sixth Circuit held that "by relying on [the defendant's] silence at trial as a sentencing factor, the district judge did not simply contravene § 3553; he burdened a fundamental constitutional right." *Cabrera*, 811 F.3d at 812.

The Court should focus on the correct test for specific deterrence as recited in *United States v. Russell*. Ms. Eicher has zero criminal history points. Her conduct on pretrial release is flawless. This is what should guide the Court regarding specific deterrence. Based on this history there is little reason to believe that she will commit future crimes. These aspects of Jolene weigh in favor of the sentence she proposed.

The government asserts that Ms. Eicher assisted others in climbing the steps of the Capitol. In doing so the government assumes something from a photograph that is not supported by the photo or testimony at trial. The government offered at trial and included in their sentencing memo Government Exhibit 706. This photograph appears to show Ms. Eicher standing on a stair outside the Capitol building. One hand is on the railing, the other appears to be reaching for something. That something is the backpack of the person teetering outside the

railing.  This photograph does not show Ms. Eicher lifting a person up the stairs.  It shows an act of concern for someone in a position of risk.  Stopping someone from falling to the injury of themselves or others below them is not an aggravating factor.

The government seeks a period of imprisonment for Ms. Eicher.  Before the Court considers sentencing Ms. Eicher to prison for her conduct the Court should consider the nature of such a sentence.

Any sentence of incarceration by this Court will be served in a Bureau of Prisons facility.  Waylon Jennings reminisced in *Are the good times really over for good* (MCA 1981), about how "the joint was a bad place to be."  It is.  Bureau of Prisons facilities are very bad places.  Bad for the imprisoned.  Bad for the imprisoners.

The Bureau of Prisons has been routinely and repeatedly criticized for poor operation.  Operation that jeopardizes the safety of the imprisoned.  Operation that jeopardizes the safety of the staff.

There have been two recent detailed reports criticizing the BOP regarding the deaths of Jeffrey Epstein[1] and Whitey Bulger[2].  Each report summarizes conditions at the BOP.  The conditions at BOP facilities should be considered by the Court under 18 U.S.C. §3553(a) regarding sufficiency; 18 U.S.C. §3553(a)(2)(A) regarding just punishment; and 18 U.S.C. §3553(a)(D) regarding provision of training, care, or treatment in the most effective manner.  Based on conditions at

---

[1] https://oig.justice.gov/sites/default/files/reports/23-085.pdf (last visited July 31, 2023).
[2] https://oig.justice.gov/sites/default/files/reports/23-007_0.pdf (last visited July 31, 2023).

the BOP there is serious doubt about whether training, care, or treatment can be provided at all on the inside.

The investigation regarding Epstein had several criticisms and conclusions regarding BOP operations.  As stated in the summary of the conclusions of the Epstein report, "This is not the first time the OIG has found significant job performance and management failures on the part of BOP personnel and widespread disregard of BOP policies that are designed to ensure that inmates are safe, secure, and in good health."  (Epstein P. iv).

That there have been multiple reports prepared with similar findings shows the Court the importance of the circumstances of confinement.  Consider this conclusion of the OIG regarding the prison yard murder of Whitey Bulger:

> The fact that the serious deficiencies we identified occurred in connection with a high-profile inmate like Bulger was especially concerning given that the BOP would presumably take particular care in handling such a high-profile inmate's case. We found that did not occur here, not because of a malicious intent or failure to comply with BOP policy, but rather because of staff and management performance failures; bureaucratic incompetence; and flawed, confusing, and insufficient policies and procedures. In our view, no BOP inmate's transfer, whether they are a notorious gangster or a non-violent offender, should be handled like Bulger's transfer was handled in this instance.

(Bulger P. iv).  That the BOP decided to place Whitey Bulger, an 89-year-old man in wheelchair who was known to have cooperated with the FBI, in general population is a shockingly simple example of what the OIG has repeatedly found.  Failures at multiple levels such that persons ordered to serve time in prison are subjected to dangerous circumstance that could easily be avoided.

The Epstein OIG summary noted that negligence, misconduct, and outright job performance failures contributed to the opportunity for Epstein to kill himself. (*Epstein P. iv*).  The OIG conclusion in that case continued, "The fact that these failures have been recurring ones at the BOP does not excuse them and gives additional urgency to the need for DOJ and BOP leadership to address the chronic staffing, surveillance, safety and security, and related problems plaguing the BOP." (*Id.*)  The words chosen by the OIG are important.  "Recurring" "Chronic" and "Plaguing" are ominous warnings for Courts.  Worse, the BOP does not appear to have done anything to address these repeated problems that effect the safety of all inside their facilities or to provide the programming and care of those in their charge.

There is a fact within the Epstein report that could easily be overlooked, cameras in the facility were in need of repair.  The technicians who were sent to make those repairs were taken away from that task to work as corrections officers.[3] This augmentation is common within the BOP.  All BOP employees are trained as corrections officers so that corrections positions may be augmented.  That is a prison nurse, or cook, or attorney, or psychologist, or physician may be pulled from

---

[3] As the camera upgrade project was beginning, BOP officials recognized that MCC New York's mechanical, electrical, and plumbing systems were also in need of major repairs. MCC New York did not have enough qualified technicians on staff to complete both the camera installation and other repairs needed at the facility, so beginning the week of March 17, 2019, the BOP's Northeast Regional Office arranged for technicians from other BOP institutions to conduct temporary duty (TDY) assignments at MCC New York to perform the work. During the course of the TDY rotations, work was not consistently conducted on the camera upgrade because sometimes TDY staff assigned to the project were used to cover shortages at MCC New York's custody posts, and sometimes there were not enough TDY volunteers who possessed the skills required to do the camera work. (Epstein P. 82, emphasis added).

their area of expertise to walk a cell block or man a tower.  This informs the Court

regarding the provision of care in the most effective manner, 18 U.S.C.

§3553(a)(2)(D).  This supports a sentence outside the walls.

The longer-term effects of incarceration must also figure into the analysis.

"New research expands the notions of collateral consequences beyond post-release

barriers and discrimination.  Two studies show that incarceration shortens life

expectancy, at both the national and individual level."[4]  From one of those studies:

> the reduced life expectancy resulting from incarceration impacts
> individuals, families, and communities on a personal level. In her
> 2013 analysis of New York state parole data, Professor Evelyn
> Patterson identified a linear relationship between incarceration and
> life expectancy: for each year lived behind bars, a person can expect to
> lose two years off their life expectancy. In the parole cohort she
> studied, five years in prison increased the odds of death by 78% and
> reduced the expected life span at age 30 by 10 years. Time served has a
> direct correlation to years of life lost.[5]

The reduction in life expectancy due to incarceration has effected the life expectancy

of the nation.

> In comparison to other developed democracies, Wildeman finds that from
> 1981 to 2007, the U.S. life expectancy would have increased by more than five
> years – from 74.1 to 79.4 years – if not for mass incarceration. But given the
> reality of mass incarceration, the U.S. life expectancy only increased 3.5
> years over that time. Without so many people behind bars, he argues, the life
> expectancy at birth would have increased 51% more than it actually did from
> 1981 to 2007. The sheer magnitude of how many people are locked up
> shortens our entire nation's life expectancy.[6]

That is the lives of all of us and everyone we know is likely to be shortened because

of the rate at which we incarcerate members of our community.

---

[4] https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/ (last visited August 9, 2023)
[5] *Id.*
[6] *Id.*

Still another harm to the community that informs the sufficiency of sentences is the effect on the jailers.  In a report from 1982 the DOJ office of Justice Programs found the average life expectancy for a corrections officer was just 59 years compared to 75 for the population as a whole.[7]  Corrections officers go home at night while the inmates remain within.  That the employees' lives might be shorter because of where they spend a portion of their lives speaks to the sufficiency of any sentence for those who remain within those walls constantly.  This supports a sentence outside the walls of a prison.

These many reasons inform the Court on what is sufficient and what is just, 18 U.S.C. §3553(a) and (a)(2)(A), for someone with non-violent misdemeanor convictions and no prior criminal history.  The Court should not sentence Jolene Eicher to a term of imprisonment.  Rather, a sentence of substitute punishment with a term of supervision is sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,

**Mary Maguire**
Federal Public Defender
Western District of Virginia

Matthew Hill
Assistant Federal Defender
Missouri Bar No. 47889
New Hampshire Bar No. 18864
Arkansas Bar No. 2018170
201 Abingdon Pl
Suite 201
Abingdon, VA  24211

---

[7] https://www.ojp.gov/ncjrs/virtual-library/abstracts/reducing-staff-and-inmate-stress (last visited August 9, 2023)

(276) 619-6080
Fax: (276) 619-6090
matt_hill@fd.org

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document was filed electronically and a copy will automatically be sent to all counsel of record by the CM/ECF system.

/s/Matthew Hill